**NEW YORK STATE ASSOCIATION OF CAREER SCHOOLS, et al.,**
Plaintiffs,

v.

**STATE EDUCATION DEPARTMENT OF THE STATE OF NEW YORK, et al.,**
Defendants.

No. 90 Civ. 5560 (RWS).

United States District Court,
S.D. New York.

May 14, 1993.

Carl E. Person, New York City, for plaintiffs.

Lizette A. Cantres, Albany, NY (Lizette A. Cantres, Kathy A. Ahearn, of counsel), for defendants.

## OPINION

SWEET, District Judge.

The Defendants State Education Department of the State of New York (the "State"), its Commissioner (the "Commissioner") and certain of its officers and employees (collectively "SED") have moved pursuant to Rule 56, Fed.R.Civ.P., for an order granting summary judgment against the Plaintiffs, New York State Association of Career Schools, Inc., NYS Beauty Schools Association, Inc., and certain schools that are members of the two organizations (collectively "NYSACS").

SED's motion was taken on submission on January 6, 1993, and for the reasons set forth below, the motion is granted.

### The Facts and Prior Proceedings

The facts and prior proceedings are fully set forth in the prior opinions of this Court, familiarity with which is presumed. *See New York State Ass'n of Career Sch., Inc. v. State Educ. Dep't,* 142 F.R.D. 403 (S.D.N.Y.1992) ("*NYSACS II* "); *New York State Ass'n of Career Sch., Inc. v. State Educ. Dep't,* 749 F.Supp. 1264 (S.D.N.Y.1990) ("*NYSACS I* ").

Following *NYSACS II,* granting NYSACS's motion to amend its complaint ("Original Complaint"), NYSACS filed an amended complaint ("Amended Complaint") on June 25, 1992. In the Amended Complaint, NYSACS narrowed its focus to challenge only the course and curriculum review provisions of Chapter 887 of the Laws 1990, which amended Education Law § 5002(4) and (5) (McKinney 1981 & Supp.1992) (the "Statute"). Section 5002(4) sets forth the criteria and the procedures to be employed in the process of approving proposed courses and curricula of licensed private schools and registered business schools, while § 5002(5) does the same for the curriculum reapproval process.

The gravamen of the Amended Complaint, like that of the Original Complaint, is that these review provisions violate the proprietary schools' First Amendment rights of freedom of speech and association, the Fourteenth Amendment's equal protection and due process clauses, comparable provisions of the New York State Constitution, and of the Civil Rights Act, 42 U.S.C. § 1983. However, the Amended Complaint's allegations are distinguishable from those set forth in the Original Complaint insofar as the former attack the review provisions on the grounds that they are content-biased prior restraints imposed on NYSACS's First Amendment rights under color of statute, and that they are part of a scheme which fails to provide adequate procedural safeguards to protect those rights.

In *NYSACS I,* this Court held that NYSACS's First Amendment claim as set forth in its Original Complaint was defective and could not support the request for injunctive relief because it erroneously equated the regulation of schools with the regulation of speech. *See* 749 F.Supp. at 1272; *NYSACS II,* 142 F.R.D. at 405–406. The specific regulations challenged by NYSACS in the Original Complaint "only dealt with a school's curriculum to the extent the law prohibited a [New York Education Law] § 5001 school from offering the types of courses licensed to § 5002 schools," which are generally business-type courses. *Id.* at 405. *NYSACS I* held that regulations that distinguished between § 5001 and § 5002 schools are content neutral and unrelated to the suppression or promotion of ideas or view points for First Amendment purposes. *See* 749 F.Supp. at 1272.

While rejecting NYSACS's First Amendment claim in the Original Complaint, this

Court did note the one possible area of genuine First Amendment concern in the regulatory scheme, namely, the regulation of courses and curricula to be offered by the schools:

> Although facial challenges of a licensing or regulatory scheme are generally disfavored, they may be raised in a First Amendment context where the licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad. A licensing scheme has the potential to permit suppression of constitutionally protected speech where there are inadequate procedural safeguards to ensure prompt issuance of the license.

*Id.* (citations and internal quotation marks omitted). Thus NYSACS's First Amendment claim was deemed defective because its thrust was:

> not that there are inadequate procedural safeguards to ensure the prompt issuance of a license or that the risk of delay in every case will equal a suppression of ideas, but rather that there are multiple regulations governing the licensing of NYSACS.

*Id.*

In granting NYSACS's motion to amend the Original Complaint, this Court observed that the Amended Complaint did address the issue of content-biased curriculum review:

> In the proposed complaint, the Plaintiffs would allege that a school cannot be licensed until the content of its curriculum is approved, and that one of the criteria employed is that its "content will enable the student to develop those skills and competencies required for employment in the occupational area for which the curriculum was developed."

*NYSACS II,* 142 F.R.D. at 405.

NYSACS contends that the constitutional claim asserted in the Amended Complaint falls squarely under the First Amendment. Therefore, while NYSACS explicitly alleges violations of the due process and equal protection clauses of the Fourteenth Amendment, it states that it is not asserting an independent Fourteenth Amendment claim.

Rather, the Fourteenth Amendment is invoked "solely for the reason of having the First Amendment rights be enforceable against defendants through the 14th Amendment." Pls.' Opp. Mem. at 2.

***Discussion***

## I. *Rule 56 Standards for Summary Judgment*

The Rule 56 motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1, namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ. of New York,* 947 F.2d 1021, 1022 (2d Cir.1991).

The Second Circuit has repeatedly noted that "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (citing *Celotex v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting) and *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)); *see United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 993, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

When a motion for summary judgment is made and the nonmoving party will bear the

burden of proof at trial, "Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the nonmoving party's claim." *Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 116 (2d Cir.1991). However, if the moving party is still entitled to judgment as a matter of law after all the facts alleged by the nonmoving party are resolved in his favor as true, then any remaining factual disputes are neither "genuine" nor "material" and will not prevent the court from granting the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("a material fact is 'genuine' ... if the evidence is such that a reasonably jury could return a verdict for the nonmoving party"). Thus, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Finally, the court must look to the substantive law to determine which facts are "material," to wit, disputed facts that might affect the outcome of the suit under governing law. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. It follows, then, that "[e]ntry of summary judgment indicates that no reasonable jury could return a verdict for the losing party." *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162 (2d Cir.1991).

## II. Standards for a First Amendment Claim

### A. The "O'Brien" Test

In *United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968), the Supreme Court set forth the test to be employed by courts to analyze government regulation of conduct that may have an expressive element. As this Court recently discussed in *Loper v. New York City Police Dep't*, 802 F.Supp. 1029 (S.D.N.Y.), *appeal docketed*, No. 92–9127 (2d Cir. Oct. 13, 1992), under *O'Brien*, a government regulation is sufficiently justified when: (1) it is within the constitutional power of the Government; (2) it furthers an important or substantial governmental interest; (3) the governmental

interest is unrelated to the suppression of free expression; and (4) the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

802 F.Supp. at 1039 (quoting *Young v. New York City Transit Authority*, 903 F.2d 146, 157 (2d Cir.), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990)); *accord Barnes v. Glen Theatre, Inc.*, —— U.S. ——, 111 S.Ct. 2456, 2461, 115 L.Ed.2d 504 (1991).

The Supreme Court repeatedly has emphasized that, in applying the *O'Brien* test, a court must balance the competing interests of the parties and assess the scope of the restrictions imposed by the state. "When a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question." *Gentile v. State Bar of Nevada*, —— U.S. ——, 111 S.Ct. 2720, 2745, 115 L.Ed.2d 888 (1991); *accord Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S.Ct. 2199, 2207, 81 L.Ed.2d 17 (1984). After the state has established that it has such a legitimate interest, the restrictions it imposes are valid:

> provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (citations omitted); *see also Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990). Thus to pass constitutional muster, the restrictions in question must be so narrowly drawn that they address the state's legitimate interests "without unnecessarily interfering with First Amendment freedoms." *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). "It is not enough to show that the government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.*

### B. *Procedural Safeguards*

 When the restriction at issue constitutes a prior restraint of speech by the government, that restriction is subject to careful examination by the courts. In the first place,

> [g]overnmental action constitutes a prior restraint when it is directed to suppressing speech because of its content before the speech is communicated. This may take the form of ... systems of administrative preclearance that give public authorities the power to bar the publication or presentation of material.

*In re G. & A. Books, Inc.,* 770 F.2d 288, 296 (2d Cir.1985), *cert. denied sub nom., M.J.M. Exhibitors, Inc. v. Stern,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986). Moreover, "[a]ny system of prior restraints of expression comes [before a court] bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).

 Nonetheless, a prior restraint on free speech may be constitutional if it is attended by procedural safeguards designed to obviate the dangers of censorship system. In *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), the plaintiff challenged the constitutionality of the state motion picture censorship statute, attacking "the procedure for an initial decision by the censorship board, which, without any judicial participation, effectively bars exhibition of any disapproved film, unless and until the exhibitor undertakes a time-consuming appeal to the Maryland courts and succeeds in having the Board's decision reversed." *Id.* at 54–55, 85 S.Ct. at 737. The Court struck down the statute on the ground that the "risk of delay is built into the ... procedure" created by the statute. *Id.* at 55, 85 S.Ct. at 737.

The standard to be applied to the course and curriculum approval scheme created by the Statute is the following: "a noncriminal process which requires the prior submission of" a curriculum to the commissioner for approval·or reapproval "avoids constitutional infirmity only if it takes place under procedures to obviate the dangers of a censorship system." *Freedman,* 380 U.S. at 58, 85 S.Ct. at 739.

### III. *Applying the Standards*

 As was noted in *NYSACS I,* the regulation of schools does not *per se* constitute a regulation of speech. *See* 749 F.Supp. at 1272. However, the regulation of curriculum programs directly relates to NYSACS's First Amendment rights, *see id.,* and the mere fact that the Plaintiffs are proprietary schools and the associations to which those schools belong does not remove their speech from the ambit of the First Amendment, *see Austin,* 494 U.S. at 657, 110 S.Ct. at 1396.

 The question presented is whether the Statute violates NYSACS's First Amendment rights of freedom of association and freedom of speech either by imposing a prior restraint on NYSACS's exercise of those rights or by invalidly impinging on those rights through content-biased regulations. The following analysis of the Statute reveals that they do not violate NYSACS's First Amendment rights.

### A. *The Statute Constitutes a Prior Restraint*

NYSACS contends that the review procedures set forth in the Statute constitute a "pervasive regulatory scheme" that centers on program content approval as a condition of program licensure. Am. Compl. ¶ 23. As such, this scheme imposes prior restraints on NYSACS's in violation of their First Amendment rights.

Examples of the alleged prior restraints set forth in the Amended Complaint include the following: rejecting programs previously approved by defendants; requiring schools to change the number of hours in, the title for, and the entrance requirements for previously approved programs; requiring schools to change the number of hours in a program without any justification or knowledge of the subject matter at issue; rejecting programs during requirement reapproval procedures; creating entrance requirements for programs that are unrealistic; requiring specific material to be added to or deleted from a program; using non-experts hired by the SED

to tell NYSACS what instruction to give in the programs; preventing schools having one type of license from offering instruction as part of an overall program that addresses subjects generally offered by schools having the other type, thereby preventing all schools from offering instruction in programs that cut across various disciplines; and requiring schools to wait many months and sometimes years to obtain required prior approvals for the schools to be able to offer or give instruction in any program.

For the purposes of this motion, all inferences and ambiguities to be drawn from the facts set forth in the Amended Complaint are resolved in favor of NYSACS, *see Brady,* 863 F.2d at 210, and to the extent that these review procedures do restrict the Plaintiffs' freedom of association and expression, they do impinge on the Plaintiffs' First Amendment rights as prior restraints. The issue, then, is whether these prior restraints and the regulatory scheme of which they are a part are constitutionally valid pursuant to the stringent requirements of the four-pronged *O'Brien* test.

### B. The State of New York has the Power to Regulate Proprietary Schools

The first prong of the *O'Brien* test requires a showing that it is within the constitutional power of the State of New York to regulate proprietary schools. This requirement is clearly satisfied in light of the fact that it is undisputed and well-settled proposition of law that this State, in its exercise of police power, may regulate private schools. *See Pierce v. Society of Sisters,* 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 402, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923).

### C. The Statute Furthers an Important and Substantial State Interest

The interests of the State of New York in regulating proprietary schools are set forth in *NYSACS I.* The regulatory scheme created by the Statute is justified by the long and substantial history of proprietary schools that includes "student abuses, closure rates, loan default rates, ·and program deficiencies such as a lack of equipment and teachers." 749 F.Supp. at 1273; *see also id.* at 1274–75

(discussing the rational basis for classifying proprietary schools as distinct from nonproprietary schools); *Association of Accredited Cosmetology Sch. v. Alexander,* 774 F.Supp. 655, 657 (D.D.C.1991) (discussing the conclusions set forth in the Report of the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, S. Rept. 02–58 (May 17, 1991), on the abuses of proprietary schools). The indisputable conclusion is that proprietary schools, when considered as a discreet group and compared with nonproprietary schools, have a disproportionate rate of effectively defrauding their students by failing to supply the product they have advertised and defrauding the government by abusing the student loan system. *Cf. Gentile,* —— U.S. at ——, 111 S.Ct. at 2745 (holding that restrictions on extrajudicial statements by attorneys, which are substantially likely to materially prejudice an adjudicative proceeding, do not violate the First Amendment because the restrictions addressed two genuine concerns of paramount interest to the state: that attorneys' comments can influence the actual outcome of a trial, and that comments are can prejudice the jury venire even if an untainted panel were to be found). It is these genuine concerns regarding fraud and abuse that are of paramount interest to the State of New York and that the Statute aims to address.

In light of the findings in *NYSACS I* and SED's proofs offered here, SED has established that the Statute addresses a well-defined set of important and substantial governmental interests and thereby satisfies the second prong of the *O'Brien* test.

### D. The Statute Addresses Interests that are Unrelated to the Suppression of Free Expression

 The third prong of *O'Brien* requires that the governmental interest addressed by the regulatory scheme be unrelated to the suppression of free expression. As this Court noted in *Loper,*

Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment. This prohibition even extends to the commercial arena,

where such regulations raise the specter that the government may effectively drive certain ideas or viewpoints from the marketplace. It is in only narrowly drawn instances that such regulations are allowed, and then only because of the constitutionally proscribable content of such speech.

802 F.Supp. at 1039–40.

NYSACS alleges that the scheme fails to satisfy this requirement because the Statute allows and even requires SED to discriminate on the basis of the content of a proposed course or curriculum. Specifically, NYSACS supports this claim by pointing to § 5002(4), which provides that "(b) [i]n approving curriculum, the commissioner shall take into consideration ... (2) that the content will enable the student to develop those skills and competencies required for employment in the occupational area for which the curriculum was developed." *See NYSACS II*, 142 F.R.D. at 405.

■■■ *Pace* NYSACS's claim, the Statute does not fail the third prong of the *O'Brien* test on this ground. Rather, NYSACS has misconstrued the content-neutral requirement *O'Brien* imposes on a regulatory scheme affecting First Amendment rights in its analysis of § 5002(4). The critical issue is not whether SED makes its decisions based on a review of the content of proposed courses and curricula, but whether that review is motivated by an interest that is related to the suppression of free expression.

As was noted above, the governmental interests addressed by the Statute are fraud and abuse. By enacting the Statute, the State of New York created a regulatory scheme designed to minimize the incidents of fraud and abuse perpetrated by proprietary schools on their students and on the government. The governmental interest is not that of suppressing a particular message or form of free expression. Therefore, the Statute, motivated as it is by those legitimate governmental interests, does not infringe on NYSACS's First Amendment rights.

Furthermore, the Statute and SED's actions are readily distinguishable from those statutes and state actions that have been identified as impermissible violations of fundamental First Amendment rights. *See, e.g., Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 866, 102 S.Ct. 2799, 2807, 73 L.Ed.2d 435 (1982) ("First Amendment rights of students may be directly and sharply implicated by the removal of books from the shelves of a school library"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978) (precedents of Supreme Court have focused "not only on the role of the First Amendment in fostering individual self-expression but also on its role in affording the public access to discussion, debate, and the dissemination of information and ideas"); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (invalidating state anti-evolution statute and reaffirming duty of federal courts "to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry"); *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) ("First Amendment ... does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) ("the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge").

This conclusion follows from the language of § 5002(4)(b)(2) itself. The content of the proposed curriculum is not considered, nor is judgment passed on it, in a vacuum. Rather, it is to be evaluated within the context of "those skills and competencies required for employment in the occupational area for which [the] curriculum was developed." § 5002(4)(b)(2). In other words, the content of the curriculum is assessed by SED within the parameters defined by NYSACS itself as it represents to the public the skills and competencies with which the curriculum will provide a student for employment in a specific occupational area.

The Statute is content neutral because NYSACS remains free to determine the occupational areas upon which it will focus its programs and to formulate the courses and

curricula it will offer to provide students with the skills and competencies that are required for those areas. The Statute only authorizes SED to act to ensure that the choices and representations NYSACS makes regarding occupational areas of focus, on the one hand, and courses and curricula, on the other, are sufficiently related so that the student and the government will get what they pay for were the student to enroll in a particular course or pursue a particular curriculum.

Thus the Statute does not violate the basic First Amendment right of NYSACS to make decisions, *see Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 & n. 12, 106 S.Ct. 507, 514 & n. 12, 88 L.Ed.2d 523 (1985) ("Academic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also ... on autonomous decisionmaking by the academy itself."), or the rights of NYSACS and its prospective students to convey and receive information and ideas, *see Pico*, 457 U.S. at 867, 102 S.Ct. at 2808; *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969); *Kleindienst v. Mandel*, 408 U.S. 753, 762–63, 92 S.Ct. 2576, 2581–82, 33 L.Ed.2d 683 (1972); *see also Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 511, 89 S.Ct. 733, 739, 21 L.Ed.2d 731 (1969) ("students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate").

The Statute is unrelated to the suppression of the free expression of speech and is not designed to allow SED to act in a discriminatory manner against the content of certain forms of speech. Thus the Statute satisfies the third prong of the *O'Brien* test.

**E.** ***The Statute Employs the Least Restrictive Means and Incorporates Procedural Safeguards to Protect NYSACS's First Amendment Rights***

■ Reflecting on the appropriateness of judicial review of licensing and regulatory schemes, this Court stated in *NYSACS I* that:

> Although facial challenges of a licensing scheme are generally disfavored, they may be raised in a First Amendment context "where the licensing scheme vests unbri-

dled discretion in the decisionmaker and where the regulation is challenged as overbroad."

749 F.Supp. at 1272 (quoting *FW/PBS, Inc. d/b/a Paris Adult Bookstore II v. City of Dallas*, 493 U.S. 215, 222, 110 S.Ct. 596, 603, 107 L.Ed.2d 603 (1990)). It follows that judicial review of a licensing or regulatory scheme is appropriate when that scheme is structured in a manner that the risk of delay inherent to it is such that every application of the statute threatens an impermissible suppression of ideas. *See Paris Adult Bookstores*, at 222, 110 S.Ct. at 603; *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798 & n. 15, 104 S.Ct. 2118, 2125 & n. 15, 80 L.Ed.2d 772 (1984).

■ In considering the issue of the suppression of speech and association through the structure of a licensing or regulatory scheme, a court must consider two related but distinct factors: the scope of the restrictive reach of the scheme, *see Paris Adult Bookstores*, 493 U.S. at 222, 110 S.Ct. at 603, and the procedural safeguards built into the scheme, *see Freedman*, 380 U.S. at 58, 85 S.Ct. at 738.

### 1. *The Statute is Least Restrictive Means of Regulating Curricula*

NYSACS asserts that the Statute is presumptively unconstitutional because the regulatory scheme it creates is not the reasonable and least restrictive way to regulate curricula. To support this claim, NYSACS proposes an alternative plan in which SED would enforce a two-part policy of:

> (i) reasonable disclosure, to enable all curricula to be offered and taught, and to permit the public to determine what curricula it wants to have; and (ii) enforcement of the State's laws prohibiting fraud, for schools which describe their curriculum in fraudulent fashion, or fail to teach the curricula so described.

Pls'. Mem. in Opp'n at 4.

When the scheme proposed by NYSACS is considered in light of the legitimate interests of the State that motivated the Statute, however, it is apparent that this proposed least-restrictive plan falls far short of addressing

those concerns in an adequate manner. Most notably, NYSACS's proposal allows for State intervention only after the fraud or abuse has been perpetrated, the deficient course has been offered, the student's time and resources have been expended, the student has defaulted on his loan, and so on.

The State's interest in addressing these legitimate concerns is so significant that SED is warranted in intervening at an earlier stage in the process, namely, before a course or curriculum is offered to the public. To this end, the scheme created by the Statute is both reasonable and the least restrictive in light of the specific concerns that the State of New York has identified and seeks to address. Therefore, the Statute is not facially overbroad and does not create a presumptively unconstitutional regulatory scheme. *See Paris Adult Bookstores,* 493 U.S. at 222, 110 S.Ct. at 603. Rather, it is carefully tailored to achieve the ends set for it. *See Gentile,* —— U.S. at ——, 111 S.Ct. at 2745; *Sable Communications,* 492 U.S. at 125, 109 S.Ct. at 2836.

## 2. *The Statute Includes Sufficient Procedural Safeguards*

The second concern is whether the Statute, despite being sufficiently restricted in scope, is facially defective because of its failure to provide adequate procedural safeguards against the possibility of impermissible delay in the approval processes it creates.

In this regulatory scheme, there are two distinct places at which the possibility of impermissible delay could occur: first, in the initial application process for course or cur-

riculum approval; and second, in the subsequent application process for reapproval of a previously approved course or curriculum.

With regard to the reapproval process, there is no question but that the procedural safeguards built into the Statute are sufficient. Subsections 5002(5)(d) and (f) explicitly specify that in the event the Commissioner of Education fails to act on timely and complete applications for reapproval within 30 days and enrollment agreements and catalogs within 90 days, they are deemed approved.

The initial course and curriculum approval procedure is less straightforward. Section 5002(4)(d) governs the timing of the curriculum review process by SED and states that:

> The commissioner shall act on applications for approval of a course or curriculum within one hundred twenty days of receipt of a complete application and, in the case of denial, shall set forth in writing the reasons for such denial.

This language contrasts with that of § 5002(5) insofar as the latter explicitly states if the Commissioner fails to act within the prescribed time, the application is deemed approved. Here, however, there is no explicit statement regarding the consequence of the Commissioner's failure to act within the 120–day time period.

SED contends that there is no ambiguity here. SED interprets and applies the § 5002(4)(d) in a manner analogous to § 5002(5)(d): the Commissioner must act within 120 days of the receipt of a complete application; and if no action is taken, the application is deemed approved.[1]

1. To the extent that SED has violated NYSACS's First Amendment rights in the application of the Statute, NYSACS would have a unique cause of action against SED. However, the cause of action set forth in the Amended Complaint is exclusively limited to the issue of the constitutional validity of the Statute. Thus, while NYSACS alleges that the Commissioner has failed to act on certain applications for approval and reapproval of courses, and that these applications have not been automatically deemed approved after the time period has expired, the Amended Complaint neither states a cause of action nor seeks relief for an allegedly unconstitutional application of the Statute.

Instead of seeking relief in the form of automatic approval of applications that have not been

acted on by the Commissioner within the requisite time periods, NYSACS prays for the following relief:

1. That the statutory provisions and regulations requiring 5001–5002 schools to obtain prior review and approval of course and program content be adjudged and decreed to be in violation of (i) the First Amendment ...; (ii) comparable provisions of the New York Constitution; and (iii) § 1983 of the Civil Rights Act (42 U.S.C. § 1983).

2. That each of the defendants ... be permanently restrained and enjoined from [the] enforcing of the statutory provisions and regulations requiring 5001–5002 schools to obtain prior review and approval of course and program content or requiring 5001–5002 schools

SED represents and for consistency of the Statute this Court finds implicit in § 5002(4) the provision that if the Commissioner does not act on an application for the approval of a course or curriculum within 120 days, that application is deemed granted. Therefore, as interpreted, the Statute contains the requisite procedure safeguards to ensure that the course and curriculum approval and re-approval schemes do not impermissibly encroach upon NYSACS's First Amendment rights of speech and association.

The regulatory scheme created by the Statute, "which requires the prior submission of" a curriculum to the commissioner for approval or reapproval, "avoids constitutional infirmity [because] it takes place under procedures to obviate the dangers of a censorship system." *Freedman*, 380 U.S. at 58, 85 S.Ct. at 739. Therefore, in light of the narrow tailoring of the regulatory scheme to address the specific legitimate concerns of the State of New York and the procedural safeguards built into to scheme, the course and curriculum approval and reapproval procedures satisfy the fourth prong of the *O'Brien* test.

### F. *The Statute Does Not Violate NYSACS's Constitutional or Civil Rights*

It follows from the fact that the Statute satisfies the various criteria of the *O'Brien* test that it does not violate NYSACS's rights which are guaranteed by the Constitutions of the United States and the State of New York and the Civil Rights Act, 42 U.S.C. § 1983.

### *Conclusion*

There is no genuine issue of material fact remaining for trial on NYSACS's facial challenge of the Statute, and for the reasons set forth above, SED is entitled to a judgment as a matter of law. Therefore, SED's Rule 56

not to teach a course or program which contains educational material not approved by defendants.

3. That each of the defendants ... be enjoined from taking any action against any of the plaintiffs as reprisal for their attempts to enforce their civil rights hereunder....

motion for an order granting summary judgment in its favor is granted.

It is so ordered.

The record on this motion, even when all inferences and ambiguities are resolved in favor of NYSACS, simply does not support the claim for this relief.